**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PSALM BODDIE, EDUARDO BARRAZA, and VINCENT MARKEL, *individually, and on behalf of all other similarly situated individuals*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 1:25-cv-5480 |
| v. | ) ) ) | |
| JAY MCGRAW; ERIC WELCH; CREDITSERVE, INC.; GREETING TEAM, LLC d/b/a CUSTOMER CARE GLOBAL; MINTO FINANCIAL d/b/a MINTO MONEY; and JOHN DOES 1-15, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT – CLASS ACTION**

Plaintiffs Psalm Boddie, Eduardo Barraza, and Vincent Markel ("Plaintiffs"), individually, and on behalf of all similarly situated individuals, allege as follows:

1.      Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*. This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as "rent-a-tribe," a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

1

2. Under this model, non-tribal payday lenders and their business partners use Indian[1] tribes as a vehicle to originate illegal loans on the theory that the loans are subject exclusively to tribal law and the lender to sovereign immunity as a purported "arm-of-the-tribe," not the protections created by state usury, licensing, and consumer protection laws. But the loans nominally made by Minto Money are illegal irrespective of any purported tribal sovereign immunity, for sovereign immunity does not—and cannot—transform an otherwise illegal loan into a legal one. Rather, as the Fourth Circuit held in similar litigation: "substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Illinois. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777-79 (7th Cir. 2014). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Hengle*, 19 F.4th at 348.

3. Plaintiffs allege that Defendants Jay McGraw ("McGraw"), CreditServe, Inc. ("CreditServe"), Eric Welch ("Welch"), Minto Financial d/b/a Minto Money ("Minto Money"), and Greeting Team, LLC, d/b/a Customer Care Global ("Customer Care") (collectively, "Defendants") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91– 452, § 1. McGraw, CreditServe, Welch, and Customer Care knowingly maintained an interest in, participated in the operation of, reinvested in, and conspired with other members of the enterprise to profit from the usurious loans nominally made by Minto Money.

---

[1] Throughout this complaint, Plaintiffs use the term "Indian" rather than "Native American," reflecting the fact that tradition, caselaw, and—perhaps most importantly—many indigenous persons themselves follow that practice.

4. Plaintiffs seek actual, compensatory, punitive, statutory, and treble damages—as well as their costs and attorneys' fees—from Defendants for their participation in the unlawful lending enterprise complained of herein, which violated the usury and consumer protection laws of Plaintiffs' home states, unjustly enriched Defendants, and violated RICO. As a result of their participation in the enterprise, Defendants violated the usury laws of Plaintiffs' home states and RICO's prohibition against the "collection of unlawful debt," which RICO defines as a debt incurred in "the business of lending money" where "the usurious rate is at least twice the enforceable rate" under state of federal law. 18 U.S.C. § 1961(6).

5. In addition, Plaintiff Barraza brings claims for violations of Oregon's usury statutes, ORS §§ 82.010 and 725.045, Oregon's Unfair Trade Practices Act ("Oregon UTPA"), ORS. § 646.607, *et. seq*., and the Oregon Racketeer Influenced and Corrupt Organizations Act ("Oregon RICO"), ORS § 166.715, *et. seq.* Plaintiff Boddie brings claims for violations of California's usury and consumer protection statutes and also asserts a claim against Customer Care for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et. seq.* ("FDCPA"), stemming from misrepresentations concerning the legal status of the unlawful debts and its collection of usurious loans.

6. Further, Plaintiffs assert class common law claims for unjust enrichment and civil conspiracy. Because the enterprise's loans exceeded the interest rates permitted by the law of Plaintiffs' home states, such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. *See* Cal. Fin. Code § 22750; ORS §§ 82.010, 725.045, KRS § 286.4-991. Accordingly, Plaintiffs seek to recover all amounts paid on their and other class members' loans, as well as their costs and attorneys' fees.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted claims arising under RICO, 18 U.S.C. § 1964, and the FDCPA, 15 U.S.C. § 1692e, §1692f.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8.      The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because there is minimal diversity, there are more than 100 members of the classes (as defined herein), and the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest and costs.

9.      This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir. 1992) (finding nationwide service of process in Section 1965(b)), superseded by *Cent. States, Se. & Sw. Areas Pension Fund v. Reiner Express World Corp.*, 230 F.3d 934 (7th Cir. 2000). As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668 (7th Cir. 1987).

10.     Because Defendants are all residents of the United States and have received monies from loans made and collected in Illinois, the Court has personal jurisdiction over them under the Fifth Amendment to the Constitution of the United States. Furthermore, this Court has personal jurisdiction over each of the defendants named herein because they: (1) knowingly participated in the making and collection of unlawful loans to Illinois residents, and (2) selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because (1) a substantial part of the events giving rise to Plaintiffs' claims occurred in Illinois, including in this

District and Division and, (2) Customer Care's principal place of business and headquarters is located in Hoffman Estates, Illinois. Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in Illinois through their participation in a conspiracy and receipt of millions of dollars from loans made in Illinois.

12. Article III of the Constitution of the United States is satisfied because actions for statutory damages for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## **PARTIES**

13. Plaintiff Psalm Boddie is a natural person and a resident and citizen of Louisiana. She lived in California when the loans at issue were made to her.

14. Plaintiff Eduardo Barraza is a natural person and a resident and citizen of Oregon.

15. Plaintiff Vincent Markel is a natural person, and a resident and citizen of Kentucky.

16. Defendant CreditServe, Inc. is a corporation organized under the laws of California. Its principal place of business is 1421 Wells Branch Parkway, Pflugerville, Texas 78660, from where it, among other things, markets, funds, services, and collects loans made in the name of Minto Money.

17. CreditServe knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States. Defendant Jay McGraw is a natural person and a resident citizen of Texas.

CreditServe knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States. Defendant Jay McGraw is a natural person and a citizen of Texas. On information and belief, his permanent residence is in Austin, TX. McGraw is CreditServe's President and Secretary, and, upon information and belief, he provides capital used to fund loans nominally made by Minto Money. McGraw is the illegal enterprise's principal beneficiary.

18.     McGraw knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States.

19.     Defendant Eric Welch is a natural person and, upon information and belief, a resident and citizen of Texas. Welch is CreditServe's Chief Executive Officer and Chief Financial Officer. As such, he directs and authorizes it to engage in the high-interest lending activities complained of herein.

20.     Welch knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States. On information and belief, CreditServe operates for the benefit of Welch and McGraw.

21.     Defendant Greeting Team, LLC, doing business as Customer Care Global, is a limited liability company organized under the laws of Missouri. Its principal place of business is 2500 W. Higgins Rd, Suite 950, Hoffman Estates, IL 60169.

22.     Customer Care is a collection agency and uses the mails, interstate wires, telephone systems, and the Internet to collect consumer debts.

23.     Defendant Minto Financial claims to be an entity formed under the laws of the Native Village of Minto (the "Tribe") and does business as "Minto Money." Plaintiffs therefore

6

name it as a defendant. In return for a small fraction of the money generated from the Minto Money lending operation, the Tribe allowed the lending scheme to use its name and falsely claim that it is owned and operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Minto Money and did not fund the loans or handle the servicing or collection of the same.

24. Defendants John Does 1-15 are other natural and artificial persons involved in the illegal lending and collection activities described herein.

## FACTUAL BACKGROUND

### A. State usury and licensing laws protect consumers from usurious loans

25. "From times immemorial, governments have sought to protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (cleaned up). The United States is no exception. Indeed, "[a]s a nation, America has historically been deeply committed to usury law." Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

26. That commitment "grew directly out of shared public consciousness and acceptance" of moral traditions and laws like the English Statute of Anne, "which capped interest rates with a simple nominal annual rate of 5%." *Id*. (citing *Act to Reduce the Rate of Interest*, 1713, s Ann., c. 16 (Eng.)). "The first American usury law, adopted by the Massachusetts colony in 1641, pre-dates the U.S. Constitution by nearly 150 years." *Id*. at 1117. That law limited interest rates to no more than 8% per annum. *Id*.

27. While the states were divided on many issues, usury was not among them. Each of the original states "adopted usury laws capping interest rates" between 5% and 8%. *Id.*

28. Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including California and Oregon *i.e.*, Plaintiffs' home states where they applied for, received, and repaid their loans.

**1. California**

29. "Usury—the charging of excessive interest rates—is an ancient practice dating back to the earliest commercial civilizations."[2] Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

30. California—founded in 1850—has regulated interest rates since 1872. *See id.* at 1385.

31. The law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

32. Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan."

---

[2] Usury laws are not unique to the United States. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis has explained that "[u]sury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, *Address to National Anti-Usury Council* (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

*Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

33.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

34.     California's usury laws are primarily designed to penalize those who take advantage of "unwary and necessitous borrowers," *Del Mar v. Caspe*, 222 Cal. App. 3d 1316, 1326 (Cal. Ct. App. 1990), and its consumer and borrower protections support a robust and longstanding public policy against the types of unconscionable and usurious loans funded by Defendants. The California statutory scheme is "liberally construed and applied to promote its underlying purposes and policies" including "to protect borrowers against unfair practices by some lenders," and "encourage the development of fair and economically sound lending practices." Cal. Fin. Code § 22001(a).

35.     If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation shall directly or indirectly take or receive in money, goods, or things" and the loan is void. Cal. Civ. Code § 1916-2.

36.     Cal. Const. Art. XV § 1 reflects an important public policy of the State of California. California's prohibition on usury is enshrined in its constitution and the laws prohibiting usurious loans and granting recourse to those who have been wronged by such loans are created by statute and cannot be waived. A public policy that cannot be waived is fundamental.

37.     In addition to its general usury law, the loans at issue in this case violated California's financing laws because they were made without a license and imposed interest rates far greater than those permitted by California law. In addition, none of the Defendants has ever

had a lending license from the California Department of Financial Protection and Innovation ("DFPI").

38. As a result, California law renders the entire contract "void," including the "right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750.

39. Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**2. Kentucky**

40. Kentucky's general interest and usury statute provides a default legal interest rate but also caps the upward deviation that parties may agree to in writing. For contracts where the original principal amount is $15,000 dollars or less, KRS § 360.010 provides the following:

> The legal rate of interest is eight percent (8%) per annum, but any party or parties may agree, in writing, for the payment of interest in excess of that rate as follows: (a) at a per annum rate not to exceed four percent (4%) in excess of the discount rate on ninety (90) day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District where the transaction is consummated or nineteen percent (19%), whichever is less . . . .

*Id*.

41. KRS § 286.4-420 provides that no person shall "engage in the business of making loans in the amount or of the value of fifteen thousand dollars ($15,000) or less at a greater rate of interest, or consideration therefor than otherwise permitted by law" without first obtaining a license from the Kentucky Department of Financial Institutions.

42. And "[a]ny loan contract made in violation of [the foregoing requirement] shall be void and the lender shall have no right to collect any principal, charges or recompense whatsoever." KRS § 286.4-991.

43.     Kentucky's usury statute "is one of general applicability, designed to protect consumers from usurious rates in consumer contracts." *Grace v. LVNV Funding, Inc.*, 22 F. Supp. 3d 700, 702-03 (W.D. Ky. 2014).

**3.     Oregon**

44.     It is well-established under Oregon law that a lender may not collect on a debt that offends public morals or contravenes public policy—that includes usurious loans. *Pacific Bldg. Co. v. Hill*, 40 Or. 280, 293, 67 P. 103, 106 (Or. 1901) ("Usury is a moral taint wherever it exists, and no subterfuge should be permitted to conceal it from the eyes of the law....As a principle of international jurisprudence, no state is bound or ought to enforce or hold valid in its courts of justice any contract which is injurious to its public rights, offends its morals, contravenes its policy, or violates a public law.").

45.     The state of Oregon has aggressively enacted measures evincing this principle in order to protect Oregon residents from predatory lending practices.

46.     Under Oregon law, a lender, facilitator, broker, or agent must be licensed for the loan of $50,000 or less if the annual interest rate exceeds the legal rate of interest. ORS 82.010 and 725.045; *see also* ORS 725A.020(2) (license requirements for payday loans).

47.     Any loan made without the requisite license is void, and the entity (including successors, assignees, and affiliates) has no right to collect, receive or retain any principal or interest. ORS 725.045(1)(b). Moreover, even if the lending practices are licensed, it is illegal to charge, collect, or receive any interest from loans made at excessive rates of interest. ORS 82.010(4).

11

48.     Lenders are prohibited from making loans for less than $50,000 at interest rates exceeding the greater of twelve percent or five percent in excess of the discount rate on 90-day commercial paper. ORS §§ 82.010, 725.045.

49.     Oregon courts do not permit predatory lenders to take advantage of Oregon borrowers, even when the loans are made under the guise of an ostensibly legal enterprise:

> The courts do not permit any shift or subterfuge to evade the law against usury. The form into which parties place their transaction is unimportant. Disguises are brushed aside and the law peers behind the innocent appearing cloaks in quest for the truth. . . . If the transaction was, in fact, a loan of the kind denounced by the law of usury, no form to which the parties could resort for purposes of creating false appearances of innocence would be invulnerable to attack by the truth.

*Fidelity Sec. Corp. v. Brugman*, 137 Or. 38, 50–51, 1 P.2d 131, 136 (Or. 1931).

50.     No Defendant possesses, or has possessed, the appropriate license from the state of Oregon to issue loans with interest rates in excess of the permissible interest rate at any time relevant to this litigation.

51.     Accordingly, Defendants' loans to Oregon residents are null and void, and it was unlawful for Defendants to collect or receive any principal or interest on the loans, including the amounts paid by Plaintiffs.

**B.      The creation of the tribal lending business model**

52.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

53.     Unfortunately, despite state and some federal protections designed to prevent usurious lending, predatory financial services are heavily marketed to financially vulnerable

consumers. The collection of unlawful and usurious loans continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to bear the risk of litigation and liability for their violations of state and federal law.

54.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

55.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

56.     Prior to the "rent-a-tribe" business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[3] Such partnerships are commonly known as "rent-a-bank" schemes, as the bank participates only by lending its name and charter to the transaction.[4] Others attempted to evade state usury and consumer protection laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

---

[3] *See*, *e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp., Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17–22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

[4] *See Pennsylvania v. Think Finance, Inc.*, No. 14-7139, 2016 WL 183289, at *1 (E.D. Pa. 2016) (describing rent-a-bank scheme, where a payday lender partners with "an out-of-state bank" to act "as the nominal lender while the non-bank entity [is] the de facto lender" in a partnership that seeks to take "advantage of federal bank preemption  doctrines to insulate the [payday lending entities] from state regulation").

57. In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Indian tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

58. Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Indian tribes.

59. However, the "tribal" lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

60. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

61. However, an entity must function as a legitimate "arm of the tribe" to enjoy a tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010). 110. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

62. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and

14

overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

63.     Where, as here, non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Indian tribes and, therefore, have no colorable claim to sovereign immunity.

64.     Further, as noted above, sovereign immunity, even if legitimately invoked, does not turn an otherwise illegal loan into a legal one. *See*, *e.g.*, *United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

65.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed by the Second Circuit in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

66.     Nevertheless, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway of Katten Muchin Rosenman LLP, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

15

67.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm-of-the-tribe lending or tribal member lending. *Id*.

68.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

69.     Callaway is one of several attorneys who represented payday lenders in these transactions; another is Jennifer Weddle of Greenberg Traurig.

70.     On the other side of the table was Eric Lochen and representatives of his law firm, Lochen Law Offices PLLC, as well as an attorney named Shane Thin Elk ("Thin Elk").

71.     Thin Elk formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "Protecting Tribal Sovereignty," and Lochen Law Offices, PLLC, where he conducted seminars on "partnering with non-Tribal entities for commercial enterprises." He is now the owner of Thin Elk Law in Green Bay, Wisconsin, where he lives.

72.     Lochen and Think Elk share Callaway's erroneous legal opinion that loans nominally made through tribal entities do not need to comply with state licensing and usury laws—even when, as here, the tribe received only a nominal amount of the proceeds from the loans.

73.     On information and belief, with the assistance of Lochen and Thin Elk, McGraw, CreditServe, and Welch formed Minto Money in 2019.

74.     Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

16

75. Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied, not tribal law. *See*, *e.g.*, *Fahy v. Minto Dev. Corp.*, No. 23 C 3590, 2024 U.S. Dist. LEXIS 45147 (N.D. Ill. Mar. 14, 2024); *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734 (N.D. Ill. 2023).

76. In addition, there have been multiple class actions and government enforcement actions that have returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See generally Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, ECF 141 (E.D. Va. Dec. 13, 2019) (order granting final approval of the class settlement).

77. Despite all these litigation and enforcement efforts, McGraw, Welch, and CreditServe—together with others not yet known to Plaintiffs—knowingly aided, abetted, facilitated, and profited from the usurious lending scheme detailed herein.

**C.      Overview of Minto Money**

78. Minto Financial claims to be an entity formed under the laws of the Tribe and owned by an economic development company, Benhti Economic Development Corporation ("BEDCO"), which claims to be owned by the Tribe.

79. The Tribe is a small, isolated, and financially challenged tribe located about seventy-five miles northwest of Fairbanks, Alaska. It has approximately 223 enrolled members. The Tribe does not have a reservation. Neither Minto Money nor any other consumer lending business operates from lands claimed to be owned by the Tribe.

80. And yet, "Minto Money" claims to operate under a "tribal lending license" signed by Thin Elk, the purported "commissioner" of the Minto Financial Services Licensing & Regulatory Commission.

81.　On information and belief, the "commission" has issued only one license in its existence: the one granted to operate Minto Money.

82.　The Minto Financial Services Licensing & Regulatory Commission was created immediately before issuing this single license.

83.　The "commission" places no restrictions on interest rates charged to consumers, unlike Alaska state law which limits payday loans to $500 and caps fees at $75 for such a loan.

84.　On information and belief, Thin Elk is not a member of the Tribe; rather, on information and belief, he is an enrolled member of a tribe located thousands of miles from Alaska.

85.　The main function of the Tribe is to appear, on paper at least, to control the lending operation so that McGraw, Welch, CreditServe, and their investors can use the specter of tribal law and sovereign immunity as a way to ward off the consumers they victimize, as well as state and federal regulatory authorities.

86.　Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front, and CreditServe—at the direction of McGraw and Welch—provides the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

87.　Certain elders associated with the Tribe receive a 2% "fee" or "commission" on loan revenues.

88.　Upon information and belief, the Tribe had no control over the income or expenses of Minto Money.

89.　Instead, as in other schemes, the Tribe allowed McGraw, Welch, and CreditServe to use its name as a front and, in return, received a nominal, 2% flat fee of the revenue. *See*, *e.g.*,

Delvin D. Hawley, *Payday Lenders on the Run, Bloomberg Business Week* (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.").

90. Upon information and belief, no member of the Tribe participates in the day-to-day operations of Minto Money and all of the activities associated with Minto Money occur far away from any lands claimed to be owned by the Tribe, such as the call centers, payment processing, and servicing of the loans.

91. Despite representations that Minto Money is owned and operated by the Tribe, CreditServe, Welch, and McGraw are the de facto owners and control the lending enterprise. Put differently, those representations are false.

92. Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by McGraw, Welch, and/or CreditServe, and neither the Tribe nor its officials were allowed to access the accounts.

93. Defendants falsely claim that Minto Money loans are made in Alaska and subject exclusively to "Tribal law."

94. At all times relevant Defendants operated an interactive website that was frequently accessed by consumers in Illinois relating to their high interest loans.

95. Defendants use the website www.mintomoney.com to make loans to consumers, including consumers in California and Oregon at annual percentage rates in excess of 250%.

96. The website www.mintomoney.com is currently held via a proxy.

97. The servers used to host www.mintomoney.com are nowhere near Minto, Alaska.

19

98. The Minto Money website states that loans would not be made to persons in certain states. California and Oregon were not among those states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

**D. CreditServe, McGraw, & Welch's Involvement**

99. CreditServe, McGraw, Welch, and certain investors whose identities will be uncovered through discovery, are the primary beneficiaries of the Minto Money operation.

100. Neither McGraw nor Welch are affiliated with, or members of, the Tribe or BEDCO, nor are they Indians or members of any other federally recognized Indian tribe.

101. Likewise, CreditServe is not owned, operated, or affiliated with the Tribe or BEDCO—and no member of the Tribe has any say in its operation.

102. CreditServe's principal place of business is in Pflugerville, Texas, where CreditServe maintains sprawling offices out of which it markets, services, and collects loans made in the name of Minto Money. CreditServe also operates a call center in the U.S. Virgin Islands.

103. Jay McGraw is the President and Secretary of CreditServe. He is also the son of Dr. Phillip C. McGraw—the TV personality known as Dr. Phil. On information and belief, McGraw has provided tens of millions of dollars of capital to fund the loans made in the name of Minto Money.

104. On information and belief, McGraw has received millions of dollars of illegal interest payments made by Plaintiffs and other consumers throughout the United States.

105. Eric Welch is CreditServe's Chief Executive Officer and Chief Financial Officer. Welch is a veteran of the payday lending industry. He is also on the board of directors of the Online Lenders Alliance, a lobbyist for high interest lenders and their monied interests.

106.    Welch owns, or owned, many payday lending companies, including Helping Hand Financial, Inc. which did business in Texas as CashCash, Inc. Both lenders have been cited and fined by Texas regulatory authorities on multiple occasions.

107.    CreditServe employs approximately 100 people, including approximately 35 collection agents and 30 customer service agents. These employees are audited and monitored by CreditServe's quality assurance team, known internally as QA, who report to Welch and McGraw. Certain members of the QA team—including Kristine Macken—work from the U.S. Virgin Islands.

108.    McGraw and Welch dominate CreditServe and are responsible for all key decisions made by it.

109.    Welch and McGraw use a Minnesota company called Viking Client Services, LLC, doing business as Viking Business Services ("VBS"), to process payments to Minto Money.

110.    VBS is the largest ACH payment broker and middleman servicing the "tribal" payday lending industry.

111.    Viking's website includes a testimonial from Welch, stating: "The Viking Team works tirelessly ensuring clients are well-serviced and informed, which makes Viking the most reliable payment processor in the industry. On top of their extended hours and Sunday night ACH processing, they can integrate with any software. The extended hours are not just for processing, but they provide customer service later than other processors. Pure and simple, Viking is easy to use, reliable, and they truly put their clients first."

112.    Viking, as Viking Billing Services, spends heavily to promote its services at trade conventions and similar; for example, it was a "Gold Level" sponsor of the Online Lenders

21

Alliance ("OLA") 2022 Tribal Lending Conference, held on November 1-3, 2022 at an upscale resort in Chandler, Arizona.

113. According to the OLA, "Gold Level" sponsorship requires at least $20,000 in additional membership dues to be paid.

114. Viking was also a premium sponsor at a similar industry gathering, the "Tribal Lending Summit" in August 2022.

115. Viking processes ACH, debit card, and credit card payments for a large number of entities in the online payday lending industry, including Big Picture Loans, River Valley Loans, Oxford Financial Services, Inbox Loans, Better Day Loans, MaxLend, Blue Trust Loans, and many others.

116. All of the aforementioned lenders claim "tribal" ownership but are actually operated by non-tribal entities as part of rent-a-tribe schemes, and all typically make loans at interest rates exceeding 600% annually

117. In filings with the California and Ohio Secretaries of State, CreditServe claimed that it maintains an office at 137 N. Larchmont Suite 705, Los Angeles, California, 90004 (the "Larchmont Address").

118. A California 501(c)(3) founded by Dr. Phil—When Georgia Smiled: The Robin McGraw and Dr. Phil Foundation (the "Foundation")—also claims to operate from the Larchmont Address. Dr. Phil is the Foundation's director.

119. An attorney named Christopher Chatham served as the incorporator and agent for both CreditServe and the Foundation. Chatham is also the Foundation's Secretary and Treasurer.

120.     On information and belief, CreditServe, McGraw, and Welch together with non-tribal investors, provide the monies used to fund loans nominally made by Minto Money and are responsible for collecting such loans.

121.     On information and belief McGraw, Welch, and CreditServe have collected hundreds of millions of dollars of payments made by consumers like Plaintiffs on Minto Money loans.

122.     McGraw, Welch, CreditServe, and Customer Care are not employees, directors, affiliates, governors, parent companies, officers, members, or managers of the Tribe, BEDCO, or Minto Financial, and no principle-agent relationship exists between McGraw, Welch, Customer Care or CreditServe, on the one hand, and the Tribe, BEDCO, or Minto Financial on the other.

E.     **Customer Care**

123.     Customer Care collects debts from consumers throughout the country, including consumers residing in California, like Plaintiff Boddie, and Illinois residents.[5]

124.     Customer Care has a website (https://www.customercareglobal.com/) where it states that it "is an accounts receivable management and capital recovery firm that is committed to providing unparalleled service to clients and consumers alike...We are committed to offering the best debt collection services for your Business."

125.     Bart Miller, an executive of Customer Care described as an "Advisor" on its website, is on the Board of Directors for the Online Lenders Alliance, an organization of lenders who make loans over the Internet at an interest rate higher than most states' permissible interest rate. He is also on its Executive Committee and is their Treasurer.

---

[5]  Defendant Customer Care has recently been sued in this District for the same conduct alleged here. *See Maslana vs. Greeting Team, LLC, d/b/a Customer Care Global*, Case No. 24-cv-07096 (N.D. Ill. 2024).

126. Defendant Customer Care is a debt collector as defined in §1692(a)(6) of the FDCPA. It identifies itself as a debt collector, as described above, and is engaged in the business of collecting or attempting to collect, directly or indirectly, debts owed or due or asserted to be owed or due to others. Defendant Customer Care has also been a member of the Association of Credit and Collection Professionals ("ACA") since 2019.

**F.      Plaintiffs' Experiences**

127. In November 2022, "Minto Money" made a $1,000 loan to Plaintiff Boddie at an annual percentage rate of $642.51%.

128. In December 2022, "Minto Money" made a loan to Plaintiff Boddie at an annual percentage rate exceeding 250%.

129. Plaintiff Boddie made numerous payments on these loans, including interest payments. On information and belief, some of these payments were made to Customer Care.

130. The loans were obtained for personal purposes and not for business purposes.

131. Plaintiff Boddie applied for the loans on the internet while residing in California. Plaintiff Boddie did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loans.

132. Plaintiff Boddie used her California address when she applied for the loans and used her bank account maintained in California to receive the loans and for the subsequent ACH debits to pay down the loans. Defendants debited Plaintiff Boddie's bank account maintained in California.

133. In 2024, Defendant Customer Care began contacting Plaintiff Boddie via telephone, text message, and e-mail to collect Plaintiff Boddie's Minto Money loans.  Customer Care has

continued to attempt to collect from Plaintiff Boddie through April 2025. It did not stop until the undersigned counsel disputed the validity of the loan.

134. Defendants, including Customer Care, have collected one or more of these loans from Plaintiff Boddie via mail, email, and telephone systems.

135. No Defendant possesses, or has possessed, a license from the state of California entitling them to make loans at an interest rate in excess of the permissible rate at any time relevant to this litigation.

136. Because Defendants failed to comply with the State of California's usury and licensing requirements, Plaintiff Boddie's loans are void and no principal, interest, fees, or other charges are recoverable in connection with the loans. *See* Cal. Fin. Code § 22750.

137. In October 2024, "Minto Money" made a $405 loan to Plaintiff Barraza at an annual percentage rate of 556.39%. The disclosed finance charge is $2,709.05.

138. Plaintiff Barraza made payments on the loan, including interest payments.

139. The loan was obtained for personal purposes and not for business purposes.

140. Plaintiff Barraza applied for the loan on the internet while located in Oregon. Plaintiff Barraza did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loan.

141. Plaintiff Barraza used his Oregon address when he applied for the loan and used his bank account maintained in Oregon to receive the loan and for the subsequent ACH debits to pay down the loan. Defendants debited Plaintiff's bank account maintained in Oregon.

142. Defendants have collected, and have repeatedly attempted to collect, Plaintiff Barraza's loan via e-mail.

143. No Defendant possesses, or has possessed, a license from the state of Oregon entitling them to make loans at an interest rate in excess of the permissible rate at any time relevant to this litigation.

144. In October 2024, "Minto Money" made a $550 loan to Plaintiff Markel at an annual percentage rate of 690%. The disclosed finance charge is $2,392.29.

145. Plaintiff Markel made payments on the loan, including interest payments.

146. The loan was obtained for personal purposes and not for business purposes.

147. Plaintiff Markel applied for the loan on the internet while located in Kentucky. Plaintiff Markel did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loan.

148. Plaintiff Markel used his Kentucky address when he applied for the loan and used his bank account maintained in Kentucky to receive the loan and for the subsequent ACH debits to pay down the loan. Defendants debited Plaintiff's bank account maintained in Kentucky.

149. None of the defendants possesses, or has possessed, a license from the state of Kentucky entitling them to make loans in excess of Kentucky's permissible interest rate at any time relevant to this litigation.

150. Similarly, almost all other states treat loans such as those described herein as illegal unlicensed small loans.[6]

---

[6] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans

151.    Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

**G.      Defendants violated state usury and consumer protection laws and RICO**

152.    Defendants marketed and collected usurious loans in California, Illinois, Oregon, Kentucky, and throughout the United States. Defendants sought out residents of California, Illinois, Kentucky, and Oregon for such loans.

153.    Because the interest rates on Plaintiffs' loans exceeded the maximum permitted by their home states, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans.

---

made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9¬A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53¬166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3¬201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

154. Defendants nevertheless contend and represent on their website—and in materials sent in connection with attempts to collect the loans—that loans made in the name of Minto Money are valid and enforceable.

155. Plaintiffs dispute that the loans are valid and enforceable.

156. Upon information and belief, McGraw, CreditServe, Customer Care, and Welch have collected more than $500 million dollars from consumers in the United States pursuant to these illegal loans within the past four years.

157. Defendants' conduct thus violated, among other statutes, § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

158. RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

159. Minto Money loans charged an interest rate greater than twice the enforceable rates established by California, Kentucky, and Oregon, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

160. The means and methods by which McGraw, Welch, CreditServe, Customer Care, and other members and associates conducted and participated in the conduct of the affairs of the enterprise was, and continues to be, the operation and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under California, Illinois, Kentucky, and Oregon law—as well as the law of most states—but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

28

161. CreditServe and/or Minto Money are "enterprises" engaged in, and whose activities affect, interstate commerce, in that they are located outside of Illinois and makes loans via the Internet. The enterprise's leadership is based in Texas, and other locations as addressed herein. The enterprise operates throughout the United States, including the Northern District of Illinois, as well as in the U.S. Virgin Islands.

162. Defendants are involved in the enterprise as described herein.

163. The enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

164. The lending enterprise operates through ACH transactions, such as those involving the payments by Plaintiffs. These ACH transactions involve interstate commerce because they flow through CreditServe, McGraw, and Welch's bank accounts in Wisconsin, Minnesota, and Missouri, Plaintiffs' bank accounts, and through various intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious interest through interstate banking transactions to the Defendants in Texas and other places.

165. The lending enterprise operates through a website, created and overseen by McGraw, Welch, and CreditServe at www.mintomoney.com. The website furthers the illegal financial transactions. The website allows individuals to enter information to execute ACH wire transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

166. Defendants work together and function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers.

167.    In operating and conducting the affairs of the enterprise, Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. Defendants have modified and reinvested their collections of net revenue from the enterprise to improve the optics and viability of the business model.

168.    The predicate acts of collection of unlawful debt by Defendants are described herein. The debts incurred by Plaintiffs and all other members of the Classes and Subclasses are unlawful and unenforceable.

169.    Defendants established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiffs' and Classes and Subclasses members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the enterprise. 18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

170.    McGraw, Welch, Customer Care, and CreditServe, acting in concert with others, operated "Minto Money" in a scheme to defraud hundreds of thousands of thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates. To advance this scheme, Defendants created the enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme.

171.    Defendants knowingly intended to defraud Plaintiffs and other the victims of the lending scheme.

172. The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme created and developed by Defendants to make illegal loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits—for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by Defendants.

173. Defendants' participation in the enterprise began at some point as early as 2019, and continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Illinois consumers. Each Defendant, working together in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include oversight and approval of the collection of thousands of unlawful debts. Through such coordination and operation of the lending business, Defendants induced Plaintiffs and members of the Classes and Subclasses to repay unlawful debts. The foregoing record demonstrates that Defendants, and in concert with others, created the entire lending structure in an effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to stamp out.

174. Plaintiffs were deprived of money as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for Defendants' conduct. In addition, Plaintiffs and members of the below Classes and Subclasses have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts.

175. As a result of Defendants'—and other participants not yet known to Plaintiffs—participation in the enterprise and their violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT I:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
### (NATIONWIDE CLASS CLAIM AGAINST ALL DEFENDANTS)

176. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

177. Plaintiffs bring this claim individually and on behalf of the below classes against Defendants.

178. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(d) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(d) Class.

179. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of a class—the "California § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

> Plaintiff Boddie is a member of the California § 1962(d) Subclass.

180.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon§ 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

> Plaintiff Barraza is a member of the Oregon § 1962(d) Subclass.

181.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Markel brings this action for himself and on behalf of a class—the "Kentucky § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kentucky, and (3) repaid any amount on the loans.

> Plaintiff Markel is a member of the Kentucky § 1962(d) Subclass.

182.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

183.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5)

33

whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

184. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

185. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

186. **Superiority. Fed. R. Civ. P. 23(b)(3)**. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

187. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans. Alternatively, CreditServe is an enterprise as defined in 18 U.S.C. § 1961(4).

188. In the alternative, Plaintiffs allege that "Minto Money" is an enterprise as defined by 18 U.S.C. § 1961(4)

189. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland,

Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

190. Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the usurious lending scheme, including by aiding, abetting, and facilitating the scheme through their funding of the loans. Defendants further violated including by aiding, abetting, and facilitating the scheme through their role in the creation of the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities.

191. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)
## (NATIONWIDE CLASS CLAIM AGAINST ALL DEFENDANTS)

192. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

193. Plaintiffs bring this claim individually and on behalf of the below classes against Defendants.

194. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(b) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from
> Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado,

35

Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(b) Class.

195.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of a class—the "California § 1962(b) Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

Plaintiff Boddie is a member of the California § 1962(b) Subclass.

196.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon § 1962(b) Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

Plaintiff Barraza is a member of the Oregon § 1962(b) Subclass.

197.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Markel brings this action for himself and on behalf of a class—the "Kentucky § 1962(b) Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kentucky, and (3) repaid any amount on the loans.

Plaintiff Markel is a member of the Kentucky § 1962(b) Subclass.

198.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained by Minto Money or CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

199. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

200. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

201. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

202. **Superiority. Fed. R. Civ. P. 23(b)(3)**. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

203. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

204. Alternatively, "Minto Money" is an enterprise as defined in 18 U.S.C. § 1961(4).

205. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

206. As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining an interest in and control of the enterprise involved in the unlawful collection of debt. More specifically, Defendants engaged in the unlawful debt collection to maintain an interest in and control of the enterprises identified above.

207. Through their status as major investors, Defendants exercised considerable control over how Minto Money carried out the unlawful lending scheme as a whole. As detailed above, Defendants also reinvested the usurious proceeds back into the lending scheme, thereby increasing their involvement and the number of loans made to consumers, such as Plaintiffs.

208. Plaintiffs and the class members were injured as a result of the defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for the defendants' investment and participation in the enterprise.

209. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)**
**(NATIONWIDE CLASS CLAIM AGAINST ALL DEFENDANTS)**

210. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

211. Plaintiffs bring this claim individually and on behalf of the below classes against Defendants.

212. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs brings this action for themselves and on behalf of a class—the "§ 1962(a) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

Plaintiffs are members of the § 1962(a) Class.

213. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of a class—the "California § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

> Plaintiff Boddie is a member of the California § 1962(a) Subclass.

214. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

> Plaintiff Barraza is a member of the Oregon § 1962(a) Subclass.

215. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Markel brings this action for himself and on behalf of a class—the "Kentucky § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kentucky, and (3) repaid any amount on the loans.

> Plaintiff Markel is a member of the Kentucky § 1962(a) Subclass.

216. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

217. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3)

40

whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants reinvested in the enterprise; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

218. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

219. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

220. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

221. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

222. Alternatively, "Minto Money" and CreditServe were enterprises as defined in 18 U.S.C. § 1961(4).

41

223. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

224. As alleged above, Defendants violated § 1962(a) of RICO in three separate and distinct ways—any one of which independently suffices.

225. First, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt and using and investing such income in the establishment and operation of the tribal lending scheme.

226. Second, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the tribal lending scheme and reinvesting that income into the tribal lending scheme in order to increase the size of the scheme.

227. Third, Defendants violated § 1962(a) of RICO by using their income and proceeds to restructure usurious lending scheme and through the creation of the promissory notes entitling them to millions of dollars of future revenues of Minto Money.

228. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

229.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT IV:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(NATIONWIDE CLASS CLAIM AGAINST ALL DEFENDANTS)**

230.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

231.    Plaintiffs bring this claim individually and on behalf of the below classes against all Defendants.

232.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(c) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(c) Class.

233.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of a class—the "California § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

> Plaintiff Boddie is a member of the California § 1962(c) Subclass.

234.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon§ 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

> Plaintiff Barraza is a member of the Oregon § 1962(c) Subclass.

235.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Markel brings this action for himself and on behalf of a class—the "Kentucky § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kentucky, and (3) repaid any amount on the loans.

> Plaintiff Markel is a member of the Kentucky § 1962(c) Subclass.

236.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

237.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5)

whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

238. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

239. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

240. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

241. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans. Alternatively, "Minto Money" and CreditServe were enterprises as defined in 18 U.S.C. § 1961(4).

242. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York,

North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

243. As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme.

244. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) because the loans would not have been made but for Defendants' participation in the enterprise.

245. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V:**
**VIOLATION OF OREGON RICO**
**ORS §§ 166.715, *et. seq.***
**(OREGON CLASS CLAIM)**

246. Plaintiff Barraza restates each of the allegations in the preceding paragraphs as if set forth at length herein.

247. Plaintiff Barraza brings this claim individually and on behalf of the below class against Defendants Minto Money, CreditServe, Jay McGraw, and Eric Welch.

248. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon RICO Class"—initially defined as follows:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

Plaintiff Barraza is a member of the Oregon RICO Class.

249. Plaintiff Barraza may alter the class definition to conform to developments in the case and discovery.

250. **Numerosity. Fed. R. Civ. P. 23(a)(1).** While Plaintiff Barraza does not know the exact number of class members at this time, based on the class sizes in similar cases, Plaintiff Barraza anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

251. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and dispute resolution provisions; (2) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (3) the nature and extent of Defendants' knowledge and participation in the affairs of the enterprise; (4) whether the loans are "unlawful debt" for purposes of RICO; (5) whether the loans are unlawful loans under Oregon RICO; (6) whether Defendants violated RICO and/or Oregon RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff and the class members against Defendants.

252. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Barraza's claims are typical of the claims of each putative class member. In addition, Plaintiff Barraza is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

253. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Barraza is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Barraza nor his counsel have any interests which might cause them to not vigorously pursue this action.

254. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

255. **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

256. Oregon's RICO was "modeled after the federal [RICO] statute and federal cases interpreting the federal statute are persuasive in determining how to interpret ORICO." *Harris v. Bartlett*, 231 Fed. Appx. 616, 617 (9th Cir. 2007) (internal citations omitted).

257. Oregon's RICO generally prohibits any involvement in the collection of unlawful debts, providing that:

> (1) It is unlawful for any person who has knowingly received any proceeds derived, directly or indirectly, from a pattern of racketeering activity or through

the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest or equity in, real property or in the establishment or operation of any enterprise.

(2) It is unlawful for any person, through a pattern of racketeering activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any real property or enterprise.

(3) It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.

(4) It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsections (1), (2) or (3) of this section.

ORS §166.720.

258. Defendants' loans are "unlawful debts" as they constitute principal or interest of a debt that is legally unenforceable in the state in whole or in part because the debt was incurred or contracted for with interest rates greater than twelve percent per year in violation of ORS § 82.010. ORS § 166.715(6).

259. Each Defendant individually and the Minto Money operation collectively constitutes an "enterprise" as that term is defined in ORS § 166.715, in that the term applies to a single person, as well as any "partnership . . . or other legal entity" or "group of individuals associated in fact." *Id*.

260. Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

261. Alternatively, "Minto Money" is an enterprise as defined in ORS § 166.715.

262. Each Defendant violated Section 166.720(1) by:

   a. receiving income derived from the unlawful collection of debt and using and investing such income in the establishment and operation of the tribal lending scheme

49

b. receiving income derived from the unlawful collection of debt through the tribal lending scheme and reinvesting that income into the tribal lending scheme in order to increase the size of the scheme;

c. using their income and proceeds to restructure usurious lending scheme and through the creation of the promissory notes entitling them to millions of dollars of future revenues of Minto Money.

263. All of the loans made to consumers in Oregon included an interest rate far in excess of the enforceable rate under ORS § 82.010.

264. As alleged above, Defendants violated ORS § 166.720(2) by acquiring and maintaining interest in and control of the enterprise involved in the unlawful collection of debt. More specifically, Defendants engaged in the unlawful debt collection to maintain an interest and control of the enterprises identified above.

265. Through their status as major investors, Defendants exercised considerable control over how Minto Money carried out the unlawful lending scheme as a whole. As detailed above, Defendants also reinvested the usurious proceeds back into the lending scheme, thereby increasing their involvement and the number of loans made to consumers, such as Plaintiffs.

266. As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme, thereby violating ORS §166.720(3).

267. Plaintiffs and the class members were injured as a result of Defendants' violations of ORS §166.720 because the loans would not have been made but for Defendants' participation in the enterprise.

268. Violations of ORS § 82.010 are predicate acts.

269. Defendants have engaged in unlawful conduct by seeking to collect usurious, and therefore, unlawful loans.

270. Through their conduct, Defendants have violated and/or conspired to violate Oregon's RICO Act, as described above, in violation of ORS § 166.720(4).

271. In attempting to collect an unlawful debt from Plaintiff Barraza as a part of the enterprise, receiving proceeds from the same, and associating with the enterprise, each Defendant violated each section of ORS § 166.720.

272. Plaintiff Barraza and the Oregon RICO Class members were injured as a direct result of Defendants' violations of ORS § 166.720 by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for Defendants' conduct.

273. Plaintiff and the Oregon RICO Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Oregon RICO such that they are entitled to injunctive relief under Oregon RICO enjoining Defendants from, at a minimum, collecting on any unlawful loans issued to Plaintiff Barraza and the Class or continuing to issue such loans in violation of Oregon RICO.

274. Defendants are accordingly jointly and severally liable to Plaintiff Barraza and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to ORS § 166.725.

**COUNT VI:**
**VIOLATIONS OF THE FDCPA**
**15 U.S.C. §§ 1692(e), 1692(f)**
**(NATIONWIDE CLASS CLAIM AGAINST DEFENDANT CUSTOMER CARE)**

275. Plaintiff Boddie restates each of the allegations in the preceding paragraphs as if set forth at length herein.

276. Plaintiff Boddie brings this claim against Defendant Customer Care individually and on behalf of the below class.

277.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of a class—the "FDCPA Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, (3) Customer Care attempted to collect via a communication sent within a year prior to filing this action from, and (4) repaid any amount on the loans.

> Plaintiff Boddie is a member of the FDCPA Class.

278.    Plaintiff Boddie may alter the class definition to conform to developments in the case and discovery.

279.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** While Plaintiff Boddie does not know the exact number of class members at this time, based on the class sizes in similar cases, Plaintiff Boddie anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Defendant Customer Care specializes in collecting high-interest Internet loans, as evidenced by the connection with the Online Lenders Alliance described herein, as well as the fact that collection agencies typically obtain blocks of similar loans rather than individual loans. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

280.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1)

whether Defendant Customer Care engages in a practice of collecting or attempting to collect loans with interest rates that are higher than the respective state's allowable interest rate; (2) whether such loans are unenforceable; (3) whether collecting or attempting to collect said loans violates the FDCPA; and (4) what is the proper recovery for Plaintiff and the class members against Customer Care.

281. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Boddie's claims are typical of the claims of each putative class member. In addition, Plaintiff Boddie is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

282. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Boddie is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Boddie nor her counsel have any interests which might cause them to not vigorously pursue this action.

283. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

284. **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendant Customer Care has acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

285. The FDCPA broadly prohibits unfair or unconscionable collection methods, conduct which harasses or abuses any debtor, and the use of any false or deceptive statements in connection with debt collection attempts. It also requires debt collectors to give debtors certain information. 15 U.S.C. §§1692d, 1692e, 1692f and 1692g.

286. In enacting the FDCPA, Congress found that: "[t]here is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. §1692(a).

287. Because of this, courts have held that "the FDCPA's legislative intent emphasizes the need to construe the statute broadly, so that we may protect consumers against debt collectors' harassing conduct" and that "[t]his intent cannot be underestimated." *Ramirez v. Apex Financial Management LLC*, 567 F.Supp.2d 1035, 1042 (N.D.Ill. 2008).

288. The FDCPA encourages consumers to act as "private attorneys general" to enforce the public policies and protect the civil rights expressed therein. *Crabill v. Trans Union, LLC*, 259 F.3d 662, 666 (7th Cir. 2001).

289. Plaintiff Boddie seeks to enforce those policies and civil rights which are expressed through the FDCPA, 15 U.S.C. §1692 *et seq*.

290. Plaintiff Boddie is a "consumer" as defined by §1692a(3) of the FDCPA.

291. Defendant Customer Care is a "debt collector" as defined by §1692a(6) of the FDCPA because it regularly uses the mail and/or the telephone to collect, or attempt to collect, delinquent consumer accounts.

292. Plaintiff Boddie obtained her loan with Defendants for personal, family, or household purposes.

54

293. Defendant Customer Care violated the FDCPA, 15 U.S.C. §§1692e, 1692e(2), 1692e(10), 1692f, and 1692f(1), by attempting to collect unlawful usurious loans.

294. Defendant Customer Care's communications represent or imply that the underlying debts are legally enforceable. *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014).

295. Section 1692e provides:

False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section...

(2) The false representation of—

(A) the character, amount, or legal status of any debt;...

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer....

296. Section 1692f provides:

Unfair practices

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law....

297. The collection or attempted collection of usurious loans violates the FDCPA. *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 408 (3rd Cir. 2000); *Nance v. Ulferts*, 282 F.Supp.2d 912 (N.D.Ind. 2003); *Patzka v. Viterbo College*, 917 F.Supp. 654, 658 (W.D. Wisc. 1996); *Martinez v. Albuquerque Collection Services, Inc.*, 867 F.Supp. 1495 (D.N.M. 1994).

298. As the loans at issue were legally unenforceable, no attempts to collect them were lawful. Defendant Customer Care therefore unlawfully attempted to collect Plaintiff Boddie's loans by contacting her and representing that said loans were enforceable.

299. Accordingly, Plaintiff Boddie, individually and on behalf of the class, request: (i) the return of all amounts collected by Customer Care on behalf of Defendants and any other actual damages; (ii) statutory damages; (iii) a declaration that Defendant Customer Care's attempts to collect loans on behalf of Defendants was unlawful; (iv) and an order prohibiting Customer Care from attempting to collect the loans from Plaintiff Boddie or the class members; and (v) attorney's fees, costs, and expenses.

**COUNT VII:**
**VIOLATIONS OF OREGON USURY STATUTES**
**ORS §§ 82.010, 725.045**
**(OREGON CLASS CLAIM)**

300. Plaintiff Barraza restates each of the allegations in the preceding paragraphs as if set forth at length herein.

301. Plaintiff Barraza brings this claim individually and on behalf of the below class against Defendants Minto Money, CreditServe, Jay McGraw, and Eric Welch.

302. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon Usury Class"—initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

> Plaintiff Barraza is a member of the Oregon Usury Class.

303. Plaintiff Barraza may alter the class definition to conform to developments in the case and discovery.

304.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** While Plaintiff Barraza does not know the exact number of class members at this time, based on the class sizes in similar cases, Plaintiff Barraza anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

305.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and dispute resolution provisions; (2) whether the loans' interest rates violate ORS § 82.010; (3) whether Defendants did or did not have the appropriate licenses pursuant to ORS § 725.045 during the relevant time periods; and (4) what is the proper recovery for Plaintiff and the class members against Defendants.

306.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Barraza's claims are typical of the claims of each putative class member. In addition, Plaintiff Barraza is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

307.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Barraza is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained

counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Barraza nor his counsel have any interests which might cause them to not vigorously pursue this action.

308. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

309. **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

310. Defendants are engaged in the business of making, offering, and/or arranging loans of $50,000.00 or less.

311. Defendants are not banks or credit unions and are not licensed under any Oregon law to engage in that business.

312. Upon information and belief, Defendants have not possessed the licenses required by ORS § 725.045 to issue the requisite loans at any time relevant to this litigation.

313. Plaintiff Barraza and the class obtained loans from "Minto Money" with interest rates in excess of those authorized by ORS § 82.010 and paid interest and other charges as a result.

314. Defendants' conduct described above violated and continues to violate ORS § 82.010 and § 725.045, meaning that the loans of Plaintiff Barraza and the Class were void ab initio and that Defendants are barred from collecting any amounts on these loans.

315. Accordingly, Plaintiff Barraza, individually and on behalf of the class, request: (i) a declaration that Plaintiff Barraza's and the class members' loans were or are void ab initio; (ii)

58

and an order prohibiting Defendants from attempting to debit Plaintiff Barraza's or the class members' bank accounts to repay any cash advances.

## COUNT VIII:
## VIOLATIONS OF THE OREGON UTPA
## ORS §§ 646.607, *et. seq*.
## (OREGON CLASS CLAIM)

316.    Plaintiff Barraza restates each of the allegations in the preceding paragraphs as if set forth at length herein.

317.    Plaintiff Barraza brings this claim individually and on behalf of the below class against Defendants Minto Money, CreditServe, Jay McGraw, and Eric Welch.

318.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon UTPA Class"—initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, (3) received a communication from Defendants attempting to collect the loan within the last year; and (4) repaid any amount on the loans.

> Plaintiff Barraza is a member of the Oregon UTPA Class.

319.    Plaintiff Barraza may alter the class definition to conform to developments in the case and discovery.

320.    **Numerosity**. Fed. R. Civ. P. 23(a)(1). While Plaintiff Barraza does not know the exact number of class members at this time, based on the class sizes in similar cases, Plaintiff Barraza anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

59

321. **Predominance of Common Questions of Law and Fact**. Fed. R. Civ. P. 23(a)(2). Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether Defendants engage in a practice of attempting to collect loans with interest rates that are higher than Oregon's allowable interest rate; (2) whether such loans are unenforceable; (3) whether collecting or attempting to collect said loans violates the Oregon UTPA; and (4) what is the proper recovery for Plaintiff and the class members against Defendants.

322. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Barraza's claims are typical of the claims of each putative class member. In addition, Plaintiff Barraza is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

323. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Barraza is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Barraza nor his counsel have any interests which might cause them to not vigorously pursue this action.

324. **Superiority. Fed. R. Civ. P. 23(b)(3)**. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

325.    **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole. ORS §646.638(1).

326.    The Oregon UTPA is "designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the Unlawful Trade Practices Act's public policies as much as provide relief for the injured party." *Weigel v. Ron Tonkin Chevrolet Co*., 298 Ore. 127, 135 (Or. 1984).

327.    "Oregon's UTPA, like those of many other jurisdictions, was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Pearson v. Philip Morris, Inc*., 358 Or. 88, 115 (Or. 2015).

328.    From the UPTA's inception, the Oregon legislature found that 'none of the prohibited acts had sufficient social value to be allowed to continue and that the function of the law should be to "protect society," including protecting "gullible people from themselves."' *Clark v. Eddie Bauer LLC*, 371 Ore. 177, 186 (Or. 2023).

329.    The Unlawful Trade Practices Act provides, in part:

> (1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:
>
>> (b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

ORS § 646.608.

330.    The loans made by Defendants constitute "real estate, goods, or services" as defined in ORS § 646.605(6).

331.    Plaintiff Barraza is a "person" as defined in ORS § 646.605(4) and obtained his loan for personal, household, or family purposes.

61

332.    Defendants engaged in "trade and commerce" by advertising, offering, and distributing usurious loans to Oregon residents and collecting money related to the same. ORS § 646.605(4); *see also* 1980 Ore. AG LEXIS 199 (Nov. 5, 1980).

333.    As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme.

334.    Defendants caused confusion and misunderstanding to Plaintiff and the Class because they misrepresented the legality of the loans both when originating and collecting the loans.

335.    Plaintiffs and the class members were injured as a result of Defendants' violations of ORS § 646.608 because the loans would not have been made or collected but for Defendants making, offering, arranging, and/or collecting these loans.

336.    As described above, Defendants created an enterprise to evade state usury limits. Defendants therefore willfully engaged in the unfair and deceptive practice of making, offering, arranging, and/or collecting loans of $50,000 or less with interest rates greater than twelve percent or five percent in excess of the discount rate on 90-day commercial paper.

337.    Defendants' willfully violated the Oregon UTPA by making false or misleading representations to consumers about the legality of the loans as well as disregarding Oregon's usury limitations. Such conduct contravenes Oregon's public policy against usurious loans, mandating that Defendants be deterred from repeating the alleged conduct.

338.    Defendants did not misrepresent the nature of these loans in error—as described above, Defendants were aware that these loans were usurious and unlawful yet they conspired with themselves and others in the enterprise to violate ORS §§ 82.010 and 725.045, and each has

62

committed and continues to commit multiple overt acts in furtherance of the conspiracy (e.g., issuing and collecting unlawful loans in Oregon, establishing the lending entity, and other actions to evade Oregon law).

339. Defendants therefore disregarded Plaintiff Barraza and the Class Members' right to (1) obtain loans within the legal annual rate of interest and (2) receive complete, truthful information about the legality of their loans, entitling Plaintiff and the Class to punitive damages.

340. Defendants are not banks or credit unions, and are not licensed under any Oregon law to engage in that business.

341. Plaintiff Barraza and the class obtained loans from "Minto Money" and paid interest and other charges in doing so, thereby suffering an ascertainable loss of money or property.

342. Plaintiff Barraza did not discover Defendants' deception until contacting the undersigned counsel.

343. Defendants' conduct described above violated and continues to violate ORS § 646.607, meaning that Defendants are additionally liable to Plaintiff Barraza and the members of the class for their actual damages or statutory damages of $200, whichever is greater, punitive damages, and attorneys' fees and costs. *See* ORS § 646.638.

344. Accordingly, Plaintiff Barraza, individually and on behalf of the class, request: (i) repayments of any loan payments or $200 of statutory damages, whichever is greater; (ii) punitive damages; (iii) a declaration that Plaintiff Barraza's and the class members' loans were or are unlawful; (iv) and an order prohibiting Defendants from attempting to debit Plaintiff Barraza's or the class members' bank accounts.

**COUNT IX:**
**VIOLATIONS OF CALIFORNIA USURY LAWS**
**(CALIFORNIA CLASS CLAIM)**

345. Plaintiff Boddie restates each of the allegations in the preceding paragraphs as if set forth at length herein.

346. Plaintiff Boddie brings this claim individually and on behalf of the below classes against Defendants Minto Money, CreditServe, Jay McGraw, and Eric Welch.

347. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for himself and on behalf of the classes initially defined as follows:

> **California Usury Class**: All California residents who made a payment on any loan with Minto Money in the two years prior to the filing of suit.
>
> **California Treble Damages Subclass**: All California residents who made a payment on any loan with Minto Money in the year prior to the filing of suit.
>
> Plaintiff Boddie is a member of the foregoing class and subclass.

348. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from California consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

349. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to California consumers violated Art. XV § 1 of California's Constitution because their interest levels were too high; (2) whether Plaintiff Boddie may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff Boddie and the class members against each Defendant.

350. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Boddie's claims are typical of the claims of each putative class member. In addition, Plaintiff Boddie is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

351. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Boddie is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff Boddie and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Boddie nor her counsel have any interests which might cause them to not vigorously pursue this action.

352. **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

353. All of the loans made to California consumers in the name of Minto Money were made at an interest rate greater than 12%.

354. As explained above, Defendants received the proceeds, directly or indirectly, of the loans nominally made by Minto Money.

355. Accordingly, Plaintiff Boddie and the class members are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

## COUNT X:
## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW:

**UNLAWFUL CONDUCT**
**Cal. Bus. & Prof. Code §§ 17200** *et seq.*
**(CALIFORNIA CLASS CLAIM AGAINST ALL DEFENDANTS)**

356.    Plaintiff Boddie restates each of the allegations in the preceding paragraphs as if set forth at length herein.

357.    Plaintiff Boddie brings this claim individually and on behalf of the below class against Defendants.

358.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of the class initially defined as follows:

> All natural persons: (1) to whom a loan was made in the name of Minto Money, (2) from California, and (3) which loan was made in the four years prior to the filing of suit.

> Plaintiff Boddie is a member of the foregoing class.

359.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from California consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

360.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to California consumers violated Art. XV § 1 of California's Constitution because their interest levels were too high; (2) whether Plaintiff Boddie may recover from Defendants the amounts paid on the loans; and (3) what is the proper Boddie for Plaintiff McNutt and the class members against each Defendant.

66

361.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Boddie's claims are typical of the claims of each putative class member. In addition, Plaintiff Boddie is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

362.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Boddie is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff Boddie and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Boddie nor her counsel have any interests which might cause them to not vigorously pursue this action.

363.   **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

364.   The California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Defendants violated (and continue to violate) California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq.*, by engaging in the above-described unlawful, unfair, unconscionable, fraudulent, deceptive, untrue, and misleading acts and practices.

365.   The Financial Code provides that any loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed in violation of Cal. Fin. Code § 22302.

366.   Pursuant to Cal. Fin. Code § 22750 the loans are void and unenforceable.

367. There is a controversy between Plaintiff Boddie and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff Boddie and the class members must repay the loans made to them.

368. Declaratory relief will resolve such controversy.

369. Plaintiff Boddie and the class also seek an injunction prohibiting any future collection of their loans. Cal. Bus. & Prof. Code § 17203.

370. Plaintiff Boddie and the Class are entitled to their reasonable attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5.

## COUNT XI:
## UNJUST ENRICHMENT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

371. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

372. Plaintiffs bring this claim individually and on behalf of the below classes against all Defendants.

373. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the Unjust Enrichment Class.

68

374. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

> Plaintiff Barraza is a member of the Oregon Unjust Enrichment Subclass.

375. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Markel brings this action for himself and on behalf of a class—the "Kentucky Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kentucky, and (3) repaid any amount on the loans.

> Plaintiff Markel is a member of the California Unjust Enrichment Subclass.

376. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

377. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selection of tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because

the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

378. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

379. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

380. **Superiority. Fed. R. Civ. P. 23(b)(3)**. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

381. As detailed above, all loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming were and are unenforceable.

382. Plaintiffs and the class members conferred a benefit on Defendants when they repaid the usurious loans. Defendants knew or should have known of the benefits and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

383. The equitable doctrine against unjust enrichment applies in this context as each of these states endorse a staunch public policy against usury. Refusing to enforce the terms of these loans would further these public policies as (1) Defendants' conduct is incredibly grave and harmful, (2) the interest rate provisions are material terms to the loan agreements, and (3) refusing to enforce these loans greatly impacts Plaintiffs' available remedies, rights, and duties.

384. Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Minto Money.

## COUNT XII:
## COMMON LAW CONSPIRACY
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

385. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

386. Plaintiffs bring this claim individually and on behalf of the below classes against all Defendants.

387. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs brings this action for themselves and on behalf of a class—the "Common Law Conspiracy Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi,

Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

Plaintiffs are members of the Common Law Conspiracy Class.

388.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Boddie brings this action for herself and on behalf of a class—the "California Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

Plaintiff Boddie is a member of the California Common Law Conspiracy Subclass.

389.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Barraza brings this action for himself and on behalf of a class—the "Oregon Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Oregon, and (3) repaid any amount on the loans.

Plaintiff Barraza is a member of the Oregon Common Law Conspiracy Subclass.

390.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Markel brings this action for himself and on behalf of a class—the "Kentucky Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kentucky, and (3) repaid any amount on the loans.

Plaintiff Markel is a member of the Kentucky Common Law Conspiracy Subclass.

391.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained

72

by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

392. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and the selection of tribal law are enforceable; (3) whether Defendants combined together or with others to accomplish an unlawful purpose; (4) whether at least one member of the conspiracy committed an unlawful act; (5) whether collection of a usurious and unenforceable loan caused injuries to Plaintiffs and the class members; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

393. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

394. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

395.    **Superiority. Fed. R. Civ. P. 23(b)(3).** A class action is superior to other available methods for fairly and efficiently adjudicating the controversy, in that: (a) individual actions are not economically feasible, and (b) members of the class are likely to be unaware of their rights.

396.    As detailed above, all loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming are unenforceable.

397.    As alleged above, Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and profiting from the blatantly illegal usurious loans. Among others, these agreements include the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities through the promissory notes and related documents.

398.    Plaintiffs and the class members were injured as a result of Defendants' violations because they repaid amounts arising from the unlawful conspiracy.

399.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees.

74

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs and against Defendants as follows:

A.  An Order certifying the proposed Classes and Subclasses under Fed. R. Civ. P. 23 (b)(2) and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.  An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.  An Order declaring that Defendants committed the violations of law alleged herein;

D.  An Order enjoining Defendants from taking any further action to collect the illegal loans;

E.  An Order providing for any and all injunctive and declaratory relief the Court deems appropriate;

F.  An Order awarding monetary damages, including, but not limited to, any and all actual, statutory, punitive, compensatory, incidental, and consequential damages in an amount to be determined by the trier of fact;

G.  An Order awarding treble damages in an amount consistent with applicable law;

H.  An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I.  An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J.  Such further relief as this Court may deem just and proper.

Dated: May 16, 2025

**WALLACE MILLER**

*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
Julia A. Ozello
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606

75

T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com
jo@wallacemiller.com

*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: May 16, 2025

**WALLACE MILLER**

*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
Julia A. Ozello
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com
jo@wallacemiller.com

*Counsel for Plaintiffs*